UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| CATRINA LARKIN, Independent Administrator to Collect for the Estate of EUGENE M. VARNER Jr., deceased, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Case No. 23-cv-3015-DJQ |
| WEXFORD HEALTH SOURCES, INC, and DR. THOMAS BAKER, | ) ) ) ) |
| Defendants. | ) |

## OPINION

Before the Court is Defendants Wexford Health Sources, Inc. ("Wexford") and Dr. Thomas Baker's ("Dr. Baker") Motion for Summary Judgment. (Doc. 41).[1]

On March 7, 2021, Eugene Varner ("Varner") died from a pulmonary embolism. Pursuant to 42 U.S.C. § 1983, Catrina Larkin ("Larkin") as Administrator of Varner's Estate, alleges in Count I that Dr. Baker was deliberately indifferent to Varner's serious medical need in violation of the Eighth Amendment. (Doc. 1). Count II of the Complaint alleges state law Wrongful Death against both Defendants. Count III asserts a Medical Malpractice claim against Dr. Baker. Defendants concede Counts II and III are not subject to summary judgment. (Doc. 48, p. 32). Therefore, the only issue before the Court is whether a reasonable jury could find Dr. Baker was deliberately indifferent to Varner's serious medical need. For the reasons that follow, the Court concludes that a reasonable

---

[1] Although both Defendants moved for summary judgment, Defendant Wexford conceded that the only count against it, Count II, is not subject to summary judgment. (Doc. 48, p. 32).

jury could find deliberate indifference of a serious medical need. Accordingly, Defendants' Motion for Summary Judgment, (Doc. 41), is DENIED.

I.    FACTS

This case concerns acts and omissions that occurred while Varner was incarcerated at Illinois Department of Corrections' Jacksonville Correctional Center ("JCC"). Defendant Dr. Baker, M.D., is the medical director at the JCC and is licensed to practice medicine in the state of Illinois. Wexford is a prison medical contractor. Varner was a patient of Dr. Baker's at the JCC and an inmate from 2016 until his death in March of 2021. He died from a pulmonary embolism caused by Deep Vein Thrombosis ("DVT").

On December 4, 2020, Varner tested positive for Covid-19. On December 7, 2020, Dr. Baker gave an order to send Varner to Passavant Hospital's ("Passavant") emergency room because of 86% oxygen saturation[2] and an elevated heart rate. The providers in the emergency room conducted a series of lab tests including a D-dimer test, which is a blood test that measures D-dimer, a protein fragment the body makes when a blood clot dissolves in the body.[3] After his vitals improved, Varner was discharged on December 8, 2020, and anticoagulation therapy was recommended with direction to continue Xarelto daily for the next three weeks. Dr. Baker assumed that Varner was prescribed Xarelto in the hospital for the prevention of blood clots. (Doc. 45, p. 4). At the time, Covid-19 patients

---

[2] Leader, Deborah. Very Well Health. *"What a Dangerously Low Oxygen Level Means for Your Health"* 18 May 2025. Medically reviewed by Steffini Stalos, DO. https://www.verywellhealth.com/oxygen-saturation-914796. (Last visited September 10, 2025).
[3] Cleveland Clinic. *"D-Dimer Test"* Last Reviewed on November 11, 2021. https://my.clevelandclinic.org/health/diagnostics/22045-d-dimer-test. (Last visited on September 10, 2025).

were being put on anticoagulants such as Xarelto because of the increased possibility of blood clotting. (Doc. 45, p. 9).

On December 9, 2020, Varner was sent back to Passavant with an elevated heart rate, profuse sweating, and an oxygen saturation of 89%. He remained hospitalized until December 22, 2020. While hospitalized, Varner received anticoagulation therapy after showing an elevated D-dimer. The attending physician noted small blood clots in his urine. (Doc. 41, at ¶ 19). The hospital physician informed Dr. Baker over the phone that Varner had been medicated with Lovenox for an elevated D-dimer, but that the treatment had been stopped due to blood in his urine. (Doc. 45, p. 10).

Varner's discharge summary from Passavant included a past medical history of DVT. (Doc. 45, p. 11). DVT is a blood clot that forms in a vein. (Doc. 48, p. 20). Dr. Baker, according to his deposition testimony, did not trust Passavant's records that listed DVT as part of Varner's past medical history. (Doc. 48, p. 17).

Per his discussion with the hospital physician, Dr. Baker discontinued the anticoagulants due to blood in Varner's urine and Varner remained in the prison's infirmary until December 31, 2020. (Doc. 41, p. 5). After being released from the infirmary, Varner had a follow up appointment with Dr. Baker on January 11, 2021. There he reported he was breathing "alright" but had multiple instances since leaving the infirmary of blood in his urine, which Dr. Baker acknowledged could be an indication of blood clots. (Doc. 48, p. 7). Dr. Baker ordered a urinalysis that confirmed blood in Varner's urine, which Dr. Baker then treated for infection.

On February 4, 2021, Varner injured his left knee after he slipped and fell. Dr. Baker examined him the following day. Varner was unable to bear weight on his left leg or move around without the use of crutches. Varner had slight swelling and no obvious deformities. Varner was given an X-ray—which was read as unremarkable, pain medication, and an ACE wrap before being sent back to his housing unit with crutches. On February 11, Varner returned to Dr. Baker, unable to fully straighten his knee, reporting pain whenever he moved it. Varner was still using crutches. Dr. Baker assessed the injury as a left knee sprain and continued crutches and ibuprofen. Dissatisfied with his medical care, Varner filed a grievance on February 23, 2021. (Doc. 45, p. 13).

On February 28, 2021, Varner saw a nurse due to pain in his foot. In a progress note, the nurse noted swelling on Varner's bilateral lower extremities, namely the lower left leg and foot. (Doc. 45, p. 13–14). Varner reported that the foot "hurt worse a while ago but has gotten better. It just doesn't look right." (Doc. 41–3, p. 8). The nurse referred Varner to Dr. Baker.

On March 1, 2021, Varner reported he was immobile, had pain in his left foot, and pitting edema in his left leg. Dr. Baker did not order a follow up appointment, but instead ordered an X-ray, and according to his deposition, would have seen Varner after the X-ray was taken. (Doc. 48, p. 18). Varner also reported that he was short of breath and that he had not been going to the chow hall because he was short of breath. (Doc. 41, p. 9). Instead of going to chow hall, Varner indicated he had been eating salty foods from the commissary. Varner was still unable to straighten his injured knee but could bear some weight with pain. Dr. Baker noted there was swelling in both of Varner's legs, with pitting

4

to his lower left leg. (Doc. 41, p. 9). Dr. Baker admits that pitting edema in the symptomatic leg could be a sign of DVT. (Doc. 48, p. 14). At that time, Dr. Baker did not consider whether Varner had DVT and did not order testing for DVT. (Doc. 48, p. 17). Dr. Baker advised Varner to cut back on high salt foods, increased Varner's blood pressure medication, gave ibuprofen and ordered an X-ray of Varner's left foot. Dr. Baker also made a referral for physical therapy. Dr. Baker did not order anticoagulation therapy.

On March 3, 2025, the X-ray results showed no objective findings as to the cause of the foot pain and swelling. (Doc. 48, p. 18). Dr. Baker did not do any testing to rule out DVT. (Doc. 48, p. 17). On Saturday March 6, 2021, Varner once again saw the nursing staff concerning his left knee. Dr. Baker was not in the prison. Varner complained of limited range of motion and pain in his left knee. The nurse documented mild swelling in the knee. The nurse generated a referral to Dr. Baker based on the lack of movement and the knee pain and gave Varner a cane to use instead of crutches, per his request.

The next day, Varner was found short of breath, pale, with high blood pressure, a low pulse, and oxygen saturation of 74%. He was taken to the hospital and confirmed dead on arrival. His cause of death was a pulmonary embolism that originated from DVT in his left leg. (Doc. 41, p. 2).

II.    DISCUSSION

    A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual

dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson*, 477 U.S. at 255.

  B. Eighth Amendment Legal Standard

"The Eighth Amendment's ban on 'cruel and unusual punishments' obligates prison officials to provide medical care to prisoners in their custody." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). To determine if the Eighth Amendment has been violated in the prison medical context, the Court performs a two-step analysis. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). First, the Court must examine "whether a plaintiff suffered from an objectively serious medical condition." *Id.* at 728 (citations omitted). Second, the Court examines the prison official's "subjective state of mind" to determine whether he acted with deliberate indifference to the prisoner's medical needs. *Id.* (citation omitted). A prison official is deliberately indifferent only if he "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Dr. Baker does not dispute that Varner experienced an objectively serious medical need--DVT. Thus, at issue is the second step and whether a reasonable jury could find Dr. Baker acted with deliberate indifference.

### C. Deliberate Indifference to a Serious Medical Need

Under the Eighth Amendment, whether a defendant is deliberately indifferent to a serious medical need is subjective. *Christensen v. Weiss*, 145 F.4th 743, 752 (7th Cir. 2025). A plaintiff must "demonstrat[e] that a prison official knows of a substantial risk of harm to an inmate and 'either acts or fails to act in disregard of that risk.'" *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (quoting *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012)). It is well established that "mere negligence is not enough," and "[e]ven objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim." *Petties*, 836 F.3d at 728. Although deliberate means more than negligence, it is something less than purposeful. *Farmer*, 511 U.S. at 836.

The point between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety" or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] the inference." *Id.* at 837. The medical professional's response must be "so inadequate that it demonstrated an absence of professional judgment." *Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021) (quoting *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998)). A difference of opinion among doctors is not sufficient to establish deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "A

7

medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Id*. (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)).

1. Dr. Baker's Disregard of Varner's Past Medical History

Larkin's central argument is that a reasonable jury could find that Dr. Baker was deliberately indifferent to Varner's DVT because he disregarded Varner's reported history of DVT. Larkin argues this disregard and subsequent failure to take any measures to protect Varner from DVT rises to the level of deliberate indifference.

Larkin argues that Dr. Baker "intentionally ignored relevant medical records and failed to consider DVT at all." (Doc. 45, p. 2). Dr. Baker testified that did not trust the Passavant medical records and argues he "did not know what to make of the vague reference to a history DVT in the Passavant records." (Doc. 48, p. 30). Dr. Baker further asserts that Varner never reported any history of DVT to anyone within the IDOC. Larkin disputes that Varner never reported his history of DVT. (Doc. 45, p. 4). As it relates to the medical records, Larkin's expert, Dr. Charash, opines that Dr. Baker's distrust of the documented history of DVT was "blatantly inappropriate and lacked professional judgment." (Doc. 45, p. 27). *See Johnson,* 5 F.4th at 826 (the medical professional's response must be "so inadequate that it demonstrated an absence of professional judgment).

In addition, Larkin argues that Dr. Baker continued to be deliberately indifferent when he failed to consider DVT, given Varner's presentation on the March 1, 2021. (Doc. 45, p. 30). Larkin argues that Varner had more swelling in his left leg and foot, where the DVT was eventually located. (Doc. 45, p. 6). Larkin asserts that X-rays showed no

8

structural damage that could explain the swelling and pitting edema in Varner's legs, which Larkin argues, should have made it evident to Dr. Baker it was being caused by DVT. (Doc. 45, p. 30). Larkin argues, and Dr. Charash opines, that the shortness of breath reported on March 1, 2021, the pain, and the swollen left foot, combined with the prior history of DVT and Covid infection should have indicated to Dr. Baker that Varner was already suffering from a pulmonary embolism. (Doc. 45–6, p. 31).

Dr. Baker submits Varner's shortness of breath was due to fatigue, obesity, and because of the long walk from his cell to the chow hall. (Doc. 41, p. 9). He also attributed various symptoms to a high salt diet. Dr. Baker further argues that he believed Varner's leg swelling was due to his knee sprain, which is why he subsequently ordered physical therapy and increased Varner's blood pressure medication.

In support of his position, Dr. Baker cites *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658 (7th Cir. 2016); *Davis v. Kayira*, 938 F.3d 910 (7th Cir. 2019); and *Duckworth v. Ahmad*, 532 F.3d 675 (7th Cir. 2008). (Doc. 41, p. 18–22). None of the three, however, mandate a finding in favor of Dr. Baker.

In *Whiting*, summary judgment was affirmed because there was no evidence to support an inference that the doctor "knew better" than to pursue the course of treatment that he did. *Whiting*, 839 F.3d at 663. Notably, "no expert testified that Dr. Davidson's chosen course of treatment was a substantial departure from accepted medical judgment." *Id*. In the present case, Dr. Charash testified in his deposition that Dr. Baker had "no basis" and "no reason to distrust the past medical history of DVT." (Doc. 45-6, p. 3). He notes that Dr. Baker never documented his distrust and that "Dr. Baker's

assessment and distrust of the history of DVT from Passavant Hospital was blatantly inappropriate and lacked professional judgment." (Doc. Doc. 45–6, p. 3). Thus, *Whiting* is not analogous to the present case.

Dr. Baker's reliance on *Davis* is similarly unhelpful. In *Davis*, the Seventh Circuit affirmed summary judgment, reasoning that "[plaintiff] offers no evidence that [the doctor] knew more." *Davis*, 938 F.3d at 916. Moreover, the court emphasized "[t]here is no evidence—and certainly no expert testimony—to suggest [the doctor] clearly should have known better." *Id.* at 915. Here, Dr. Charash testified that Dr. Baker's treatment was blatantly inappropriate. (Doc. 45–6, p. 3).

In *Duckworth*, the Seventh Circuit affirmed summary judgment because there was no evidence that the doctor knew of and disregarded the risk, even though the doctor was aware the risk was a possibility. *Duckworth*, 532 F.3d at 681. This too is distinguishable from the present case. Varner's DVT history was in the record and Dr. Baker treated Varner multiple times for leg swelling.

When considering the facts in a light most favorable to Larkin, the Court finds that Larkin has presented sufficient evidence for a reasonable jury to find that Dr. Baker was deliberately indifferent to Varner's serious medical needs. Notably, this case is not primarily about a disagreement of medical opinions. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Instead, a factfinder could find that Dr. Baker ignored critical information. *See Farmer*, 511 U.S. at 836 (Deliberate "is something less than purposeful."). Dr. Baker simply states he did not trust the Passavant medical records. Although Dr. Baker's failure to diagnose DVT alone probably would not allow a reasonable jury to find deliberate

10

indifference, it together with Dr. Baker ignoring Varner's medical history of DVT could allow a reasonable jury to find he was deliberately indifferent.

### III. CONCLUSION

For the foregoing reasons, the Court finds that a reasonable jury could determine that Dr. Baker was deliberately indifferent to Varner's serious medical needs.

WHEREFORE, Defendants' Motion for Summary Judgment, (Doc. 41), is DENIED.

**ENTERED** this 16th day of September, 2025.

/s/ Douglas J. Quivey
DOUGLAS J. QUIVEY
UNITED STATES MAGISTRATE JUDGE